Marshall *vs.* Means and another.

No. 16.—Madison Marshall, plaintiff in error, *vs.* Matthew H. Means and Ephraim Kendrick, defendants in error.

[1.] Courts always discourage the objection of multifariousness, where, instead of advancing, it would defeat the ends of justice.

[2.] There is no general rule by which to determine whether a bill is multifarious or not.   It must be left to the discretion of the Court, under the circumstances of the case.

[3.] A complainant is not permitted to demand several distinct matters, of distinct natures of several defendants, nor several matters, which are perfectly unconnected of the same defendant.

[4.] A bare right to file a bill or maintain a suit, is not assignable.

[5.] Neither Law nor Equity will assist those who neglect to take care of

themselves.   Upon the maxim of *vigilantibus, &c.,* the vast and important doctrine of the Limitation of Actions is founded.

In Equity, in Houston Superior Court.   Decision on demurrer, by Judge POWERS.   April Term, 1852.

The bill alleges that on the 6th day of January, 1849, Kendrick purchased of Means, lot of land number 176, in the 13th district of Houston County, for which he agreed to pay $1200.00, and received his bond for titles.   At the same time, Means sold to Kendrick, a cotton gin, at the price of $70.00, and as a part and parcel of the land trade, Means promised that he would have a piazza made and attached to one side of said house, with a Doctor's shop at one end, and two shed rooms, with an entry between.   The lumber and nails neccessary to do which, were estimated at $50.00, which made the sum agreed by Kendrick to be paid to Means, amount to $1320.00 ; one half to fall due the first of January, 1850, the other half on the 1st of January, 1851.

The bill further charges that it was agreed on the part of Means, that he would have cleared, and put into a state of cultivation, twelve acres of wood-land, all which improvements were to be made in the year 1849, and possession of the premises was to be delivered to Kendrick, on the 1st of January, 1850.   On the 26th day of December, 1849, Marshall purchased the land and premises from Kendrick, agreeing to pay the notes held by Means against Kendrick ; which purchase he was induced to make, from the confidence reposed by him in the statements, assurances and representations of Kendrick.   Kendrick transferred to Marshall, Mean's bond for titles, on the day of the purchase.

The bill alleges that Means had transferred the notes of Kendrick before their maturity, and that Marshall had paid them off, although they were given for $44.95 too much, and " because he could not induce Means to make him titles to said land without paying the whole of said notes."

The bill further alleges, that Marshall, on the first day of January, 1850, demanded possession of the land from Means,

Marshall *vs.* Means and another.

and offered to pay the notes given for the purchase money, which Means refused, but remained upon the land until the 1st day of March, 1850, which occupation of the land by Means, for two months, was worth $50.00.

The bill further charges, that Means removed about forty loads of stable, yard, and lot manure, worth $100.00, and two thousand fence rails, worth $20.00.

The bill charges that Means failed to make the improvements upon the land, by clearing the twelve acres, erecting the piazza, Doctor shop, &c., which he agreed and promised to do.

In an amendment filed to the original bill, Marshall alleges that he purchased the land from Kendrick, at the special instance and request of Means.

The prayer of the bill was in the alternative: 1st, That Means might be decreed to pay complainant for the value of the improvements agreed by him to be made upon the land, together with the value of the lumber and nails, which was paid for, to be used in the improvement of the house; also the $50, for the occupation of the premises for the months of January and February, 1850, and the sum of $120.00, for the manure and rails carried away by him ; or if, upon investigation, it shall be found that the representations made to complainant by Kendrick are false, then the bill prays for a decree against Kendrick.

To this bill, a demurrer was filed with specifications, among which was that of " multifariousness."

The Court sustained the demurrer, and this decision is assigned as error.

WARREN and FRANKS, for plaintiff in error.

KILLEN and ROGERS, for defendants in error.

*By the Court.*—LUMPKIN, J. delivering the opinion.

This was a bill filed by Madison Marshall, against Matthew H. Means and Ephraim Kendrick. It charges, that on the 6th

of January, 1849, Kendrick bought of Means, lot of land No. 176, in the 13th district of Houston County; that Kendrick took from Means, his bond for titles; that the consideration of the bond was $1200, one-half due January the 1st, 1850, and the other half twelve months thereafter; that in connexion with, and as part of the land trade, Means sold Kendrick a cotton gin at $70, and agreed to have certain additions made to the dwelling-house; the lumber and nails with which to construct these improvements, being estimated at $50; that the consideration of the gin, lumber, and nails, was included in the land notes, and made in all, $1320, to be divided into two notes of $660 each. That instead of the notes being given, each for that amount, one of them was for $678, and the other for $686. 95; that as a part of the land trade, Means was to clear and to cultivate twelve acres of land, which at the time was under fence. That the improvements on the house and the clearing the land was to be done in 1849, and possession to be delivered the first of January, thereafter. That in executing the bond, all that part of the contract in relation to the improvement of the house, clearing of the land, the gin, lumber and nails, was by mistake or fraud, left out of the agreement.

That on the 26th of December, 1849, Marshall, the complainant, bought of Kendrick, the land, and took an assignment of the bond for titles, and assumed the payment of the notes given by Kendrick to Means. The original bill charges, that the complainant, " confiding in the statements and assurances of *Kendrick*, was induced to make said contract, and promises and agree to take up the note," but in the amended bill, he states that but for the assurances of *Means*, that the facts set forth in the bill were true, he would not have made this bargain. The bill further states, what appears by inspection to be true, that the assignment of Kendrick of the bond, omitted to specify the terms of the contracts, both between himself and Kendrick, and between Kendrick and Means.

That the complainant has paid off the notes, which he found transferred to a third person. The bill does not admit that he has received a deed, but it is to be inferred that he has. On

Marshall *vs.* Means and another.

the 1st of March, 1850, he obtained possession of the premises; that before he left the land, Means hauled off forty loads of lot and stable manure, and two thousand fence rails.

The bill seeks to remodel the contracts between Means and Kendrick, and Kendrick and complainant; and prays that Means be decreed to pay the value of clearing the twelve acres of land, the additions to the house, the lumber and nails, the mistake of $44.95, in the amount for which the notes were given; also, fifty dollars rent, for holding over the land for two months, together with the value of the manure and rails hauled off by Means, while he held possession in 1850. " Or if on the coming in of the answer and the submission of the proofs, on investigation, it should appear that all the charges in said bill are false, that then the said Kendrick, for *his fawrd*, be required and compelled to make due and adequate compensation for his default in the premises."

To this bill a demurrer was filed, on two grounds:

1. Because it was multifarious.

2. For want of equity.

[1.] Is this bill multifarious? We think so, most clearly, unless indeed, parties are permitted to include in the same proceeding, any and all matters of controversy, which exist between them. I am aware that the Courts always discourage the objection of multifariousness, where instead of advancing, it would defeat the ends of justice.

[2.] And that there is no general rule by which to determine whether a bill is multifarious or not; but it must be left to the discretion of the Court, under the circumstances of the case.

[3.] Still, we understand the doctrine to be, to this extent, well settled. That a complainant is not permitted to demand several distinct matters of distinct natures of several defendants, nor several matters perfectly unconnected, against one defendant.

Now, conceding that all the other matters of complaint grew out of the original contract, and are germain to it, what has the rent which is claimed for the occupation of the premises by Means, for two months after the time when he should have delivered

them up, to do with the first agreement? or the manure and fence
rails, which are alleged to have been hauled off?    And what
has Kendrick to do with these grievances committed by Means?
So far from Means and Kendrick being chargeable as confede-
rates, their interests are directly antagonistic to each other, and
the prayer is in the alternative, that if the testimony shall, on
the trial, not be sufficient to convict the one, that a recovery may
be had against the other.

As to the holding over by Means for two months, and the
removal of the manure and the rails, Marshall has an ample
remedy at Law, provided he has a title to the land.    He no
where avers that he has not; and it was necessary to make this
allegation, before he could ask the aid of a Court of Equity.
But it is clearly inferable from the bill, that he has a deed.
He took possession of the premises in March, 1850.    He states
in one place, that he could not induce Means to make him a
conveyance, without paying up the whole amount of the notes,
which he avers he has done.    While setting forth the specific
injuries received at the hands of Means, for failing to perform
his various undertakings, and the amount of damages accruing
to the complainant from each, he does not complain of his failure
to execute titles, as one of them; nor does he pray for titles to
be decreed.    The conclusion is inevitable, that he has them.
And if so, then the Common Law remedy is complete, for the
injuries complained of, other than those arising out of the orig-
inal agreement.

[4.] But without dwelling longer upon the question of multi-
fariousness, is there any equity in this bill?    We think not.
The alleged breaches had all accrued prior to the time when
the purchase was made by Marshall of Kendrick.    The contract
between Means and Kendrick, was made the 6th day of Janu-
ary, 1849.    All that was promised to be done, was to be per-
formed during that year, and possession delivered the first day
of January following.    Marshall bought of Kendrick, the 26th
of December, 1849, while Means was still in possession of the
premises, and before the notes given for the purchase money
were paid, or any part of them.    The *assignment, under these cir-*

*cumstances, could not be made.* It is contrary to public policy, and savors of the character of maintainance. 2 *Story's Eq. Jur.* §1040.

It is a bare right to file a bill in Equity. Before such an interest can be assigned, so as to give the assignee a *locus standi in judicio*, in Chancery, the party assigning such right, must have some substantial possession, and some capability of personal enjoyment, and not a mere naked right to maintain a suit. *Ibid.*

In *Prosser vs. Edmunds*, (1 *Younge and Coll*, 481, 496, 499,) Lord *Abinger* said : " The assignee purchases nothing but a hostile right, to bring parties into a Court of Equity, as defendants to a bill filed for the purpose of obtaining the fruits of his purchase. What is this but the purchase of a mere right to recover? It is a rule, not of our law alone, but that of all countries, that the mere right of purchase shall not give a man a right to legal remedies. The contrary doctrine is no where tolerated, and is against good policy. All our cases of maintainance and champerty, are founded on the principle, that no encouragement should be given to litigation, by the introduction of parties to enforce those rights, which others are not disposed to enforce. There are many cases where the acts charged, may not amount precisely to maintainance or champerty ; yet of which, upon general principles, and by analogy to such acts, a Court of Equity will discourage ·the practice."

Lord *Abinger* continues·: " Mr. Gridlestone was so obliging as to furnish me with a case, that of *Wood vs. Downs*, (18 *Ves.* 120,) in which it appears to me, that the principle laid down by Lord *Eldon*, goes the full length of supporting the judgment of allowing this demurrer. That was a bill filed to set aside certain conveyances, which it was alleged were obtained by the defendant in consequence of his situation of solicitor to the plaintiff ; the estate comprised in the conveyance, not being in their possession at the time, but subject to litigation. Lord *Eldon*, in decreeing relief, adopted not only the ground, that the party was the solicitor of the plaintiffs, but that the transaction was contrary

Marshall *vs.* Means and another.

to good policy.    He said, " the objection therefore, is not mere-
ly that which flows out of the relation of attorney and client,
but upon the fact that this was the purchase of a title in litiga-
tion, with reference to the law of maintenance and champerty ;
and he accordingly decreed the conveyance to be set aside, on
the ground of *litigated title.*    Here the *proceeding* is the converse
of that in *Wood vs. Downs.*    It is not to set aside the convey-
ance in question, but to establish it.    The principle is the same
in both cases."

[5.] But there is another principle upon which relief should
be refused the complainant.    Neither Equity nor Law will assist
those who neglect to take care of themselves.    *Vigilantibus no
dormientibus jura subveniunt,* is one of the earlier maxims which
we learn, both at the bar and from the books.    The whole
doctrine of *Limitations* is built upon it.    Why did not
Mr. Marshall see whether or not the things which were to have
been done during the year 1849, were done the last of that year,
when he purchased ?    He does not allege any misrepresentation,
either by Means or Kendrick, as to the execution of the con-
tract, or that his confidence was abused in this matter.    Why
did he not on the 26th of December, 1849, examine and see
whether the additions to the house had been constructed in a
workmanlike manner, and whether the twelve acres of land had
been cleared and rendered fit for cultivation ?    These were mat-
ters open to the eyes of the commonest observer.    And if they
were not already done when he made the purchase, they never
could be, for the time had arrived when, according to the agree-
ment, possession was to be delivered of the premises.    He is
guilty of the grossest negligence on his part, and assigns no ex-
cuse whatever for it.    It is not pretended that any artifice was
resorted to, either to divert his attention or prevent him from
making the necessary inquiry or examination.

Again, when he went to pay the notes, and discovered that
they were drawn for $44.95 too much, why did he not at once
repudiate the contract ?

Even an express warranty is no protection against *visible* de-

fects in personal property. A party having eyes must see or take the consequences.

In no view, therefore, which we can take of the case, can this bill be sustained.