THE CITY BANK OF MACON *et al* *vs.* BARTLETT *et al.*

1. Where the same bill embraces two or more distinct subjects, it is multifarious; but this defence is not favored by courts of equity. To sustain this objection, the bill must contain several distinct and separate matters relating to individuals with whom the objecting defendant has no concern. Where the plaintiffs have a common interest against all of the defendants in a suit as to one or more of the questions raised by it, so as to make them all necessary parties for the purpose of enforcing that common interest, the circumstance of some of the defendants being subject to dis-

tinct liabilities in respect to different branches of the subject-matter, will not render the bill multifarious.

(*a.*) The decision complained of and the alleged errors should be plainly specified.

(*b.*) Each case is to be governed by its own circumstances, and must be left in a great measure to the sound discretion of the court.

(*c.*) Multifariousness, as a ground of demurrer, is distinct from misjoinder, where the cases or claims united in one bill are of a character so different that the court will not permit them to be litigated in one record. Where all the complainants belonged to the same class and had a common interest, and all the defendants belonged to one class and were subject to a common liability, it does not matter that the extent of the rights of each of the complainants, or the liability of each of the defendants, may not be the same.

(*d.*) In order to determine whether a bill is multifarious, regard must be had to the stating part thereof, and not to the prayer alone.

2. A court of equity is the proper forum to redress frauds by which parties were induced to take stock in trading corporations or joint stock companies.

3. A person who was induced by fraud to purchase shares in a corporation cannot avoid his contract, if, after having notice of the fraud, he has derived any benefit from his shares, or in any manner has acted as a shareholder.

4. The ground of demurrer that complainants had an adequate and complete remedy at law is covered by the rulings made above.

November 6, 1883.

Practice in Superior Court. Corporations. Stockholders. Fraud. Contracts. Equity. Before Judge CARSWELL. Bibb Superior Court. April Term, 1883.

Reported in the decision.

LYON & GRESHAM; BACON & RUTHERFORD, for plaintiffs in error.

R. TOOMBS; G. T. & C. L. BARTLETT; A. PROUDFIT; W. A. LOFTON; LANIER & ANDERSON, for defendants.

HALL, Justice.

The complainants, who were subscribers to the increased or new stock of the City Bank of Macon, exhibited their

bill against the said bank, its directors, president, cashier and original stockholders, by which they alleged that—

"On the 8th day of October, 1868, the City Bank of Macon was chartered by the general assembly of the state of Georgia, and was duly organized under said charter, with a capital stock authorized of $200,000, with the power in the stockholders to increase the same to the amount of $500,000, and duly commenced business as a private joint stock company, in the city of Macon, county of Bibb, and said state according to the charter; that on or about the first day of January, 1874, the said City Bank of Macon, pretending that it had paid up its original capital stock, passed a resolution, as your orators and oratrix hereinbefore named, are informed and believe, increasing their capital stock to $300,000, and for that purpose procured the general assembly of Georgia to enact an additional charter, approved February 28, 1874, authorizing the capital stock of said bank to be $300,000, with power in the stockholders to increase the same to $1,000,000; that at that time, to-wit, on the first day of January, 1874, when said action by the then stockholders and directors and president of said bank, Charles A. Nutting was president of said City Bank of Macon, and a director and stockholder thereof, and William P. Goodall, the cashier thereof, who was also a stockholder in said bank, and that John J. Gresham, William S. Holt, William B. Johnston, John E. Jones and J B Ross, all of the county of Bibb and state aforesaid, were directors thereof; that the above-named persons as directors were stockholders in said bank," and other named defendants were stockholders. * * "That the then directors of said bank above stated, falsely pretending that said City Bank of Macon was not only solvent, but in a highly prosperous condition, besides paying large dividends to the stockholders in cash, and additional stock from the time of its organization to the time of said authorized addition to and increase of their capital stock, but that it actually had a large surplus fund, to-wit, $125,000, or some other large sum of money; and upon said pretenses gave notice, through the directors and officers of said bank, of an increase of said capital stock to the amount of $100,000, the whole of which amount of money the said officers of said bank, who were its legally authorized agents for the purpose of having said $100,000 of new or increased stock subscribed for, to-wit, its president, Charles A. Nutting, and W. P. Goodall, its cashier, assured orators would all be paid in in cash before any stock certificates would be issued; that as the stock was taken and paid for, the bank would receipt therefor, and issue the certificates when the whole $100,000 had been taken and paid, and not before, and that upon the failure to have all the $100,000 subscribed and paid for in cash, no certificates were to be issued; but the subscriptions were to be void, and the money paid in returned. Your orators thereupon, at the time afore-

said, to-wit, on the first of January, 1874, subscribed for said stock in the amounts hereinafter set out, and paid for the same then and there, on the days of the dates and the amounts of their several certificates of stock, hereinafter more fully set out and explained, received said certificates, at which time said Nutting, president, and Goodall, cashier of said bank, assured orators that every dollar of the $100,000 of stock so increased had been subscribed for and paid for in cash, and therefore the stock certificates could be issued in accordance with the plan of said increase of stock. And your orators allege and charge, and expect to prove, that at that time, when said certificates of stock were issued, only about $40,000 of the $100,000 had been paid in or has ever been paid in; that instead of complying with said agreement as above stated, and informing your orators that the whole of said stock had not been subscribed for and paid in, said officers of said bank, to-wit, its president and directors, issued to the original or old stockholders, stock certificates for $50,000, without requiring them to pay one dollar or any sum whatever therefor, and without any notice thereof being given to orators and the other new subscribers for stock, who had paid their money therefor into said bank as aforesaid, whereas in fact and in truth your orators are informed and believe, and expect to prove, and so charge, that said bank, at the time and long before said action enlarging its capital stock as aforesaid, was utterly insolvent, and that said insolvency was well known to said officers, directors, and many of the stockholders, and the whole scheme of the enlargement of the capital stock and the sale of the same to innocent persons, and the issuing of the $50,000 of said stock to the old stockholders, as above set out, was a naked fraud to cheat and deceive the public, and especially the persons who might, from said statements above alluded to and set out, be induced to take said new stock, when both the old and new stock was utterly worthless and of no value, by reason of the large insolvency of said bank, and the wrongful, illegal and fraudulent issue of said $50,000 of stock to the old stockholders.

" And your orators and oratrix aver that they have been informed and believe that a large portion of the dividends declared by the said bank were never in truth made, but that said pretended cash and stock dividends were not from any profits of the bank, as orators have been informed and believe, consists wholly of past due and utterly insolvent papers and claims, wholly uncollectible, none of which have ever been collected or can be collected.

"Your orators further. charge that they are informed and believe that of the original capital stock only $150,000.00 were ever in fact paid in, by either pretended dividends or otherwise, but that but seventy-five cents on the dollar was all that was pretended to be paid, and that said bank issued full paid-up certificates of stock to the said stockholders, under some pretence (wholly unfounded) of their hav-

ing a large uncollectible surplus of profits in the bank, consisting of insolvent debts, as above stated, which action of the officers of said bank was authorized by its directors and ratified by them, and a number of the old stockholders who received said stock certificate with a full knowledge of said facts.

"And your orators and oratrix aver, and expect to prove, that Charles A. Nutting, the president of said bank, represented himself to be, and your orators and oratrix aver that he was, in fact and truth, the agent of said bank to sell the new stock to the purchasers, and that he represented to each of your orators, personally or to their agents who purchased the stock for them, that said bank was in a sound and prosperous condition; that it had been paying from fifteen to twenty-five per cent profits; that it was, at the time of said sales of new stock to each of your orators, respectively, in a more prosperous condition than ever, and would doubtless continue to pay large profits and dividends, when, in fact and in truth, said bank was wholly insolvent and its entire capital absorbed by bad debts and fraudulent dividends, and it was then unable to pay even its depositors, all of which facts were well known to the then directors of said bank and many of the stockholders, of all of whom, stockholders of said bank, and of the bank itself, the said Nutting was the legal agent and representative; and the directors of the bank and all of its stockholders are bound by his fraudulent action in the premises, as well as their own action.

"Your orators and oratrix further aver that none of them had the slightest knowledge of the affairs of the bank, and wholly relied upon the statements of said Nutting in relation thereto, he being then the president and agent of the bank in the matters of the sale of the stock; and that each of your orators paid at the time of sale of said stock to them, the full amounts in their respective certificates of stock, *bona fide*, and without any knowledge, or even suspicion of the falsity of the statements made to them by said Nutting, and with entire confidence in the truth of said false and fraudulent statements.

"Your orator, Joseph M. White, is informed that he purchased the stock so fraudulently issued to C. A. Nutting, but of this he had no notice, but bought the same in good faith and paid for the same dollar for dollar.

"And your orators further state that, without any knowledge of these facts, they accepted two dividends on said stock, which was declared by said directors, as did all the rest of the stockholders, old and new, as far as your orators are informed and believe; that they received the same in the utmost good faith, and without any knowledge of the facts and frauds herein alleged.

"And your orators further allege that some time during the month of October, 1875, said Charles A. Nutting retired from the bank, sold out his stock, as your orators are informed, still owing said bank

$12,500.00 for stock subscribed for by him and never paid for, but for which said officers received his note for said sum, and did not require said stock paid for by him before they issued stock certificates to him therefor, and John J. Gresham became the president thereof, and still is such, and that Wm. S. Holt, Wm. B. Johnston, John E. Jones and J. B. Ross became directors, and still are, except John B. Ross, who recently, during the month of August, died, and whose estate is unrepresented.

"That after said Gresham became president, your orator, G. T. Bartlett, acting for himself, and all of your orators except Jos. M. White, some time during the month of March last, having heard news unfavorable to the sound condition of the bank, called at the banking house of said bank in Macon, and requested the permission, and then demanded the right to inspect the books and assets of said bank with the assistance of his counsel, then present in the city, and ready to enter on said investigation, and Gresham then and there refused your orators' attorney to inspect said papers, or to be present at said investigation; that he also refused to show to orator G. T. Bartlett the report of the directors to the stockholders, or to permit said Bartlett to read the same; that said Gresham, president, as aforesaid, also failed and neglected to make and publish a report of the condition of said bank, as required by law. Your orators further charge and allege that some time during the month of May, 1877, to-wit, on the 12th day of May, 1877, that said president Gresham, and said directors of said bank, made an assignment of all its assets of every nature whatsoever to Thomas B. Gresham, the son of said president, as assignee of said bank, and closed its doors, and that previously to that time said president and directors had sold and conveyed to John B. Ross, one of the directors of said bank, the banking house of said bank, in the city of Macon, for the sum of $15,000.00, when it was worth a great deal more, and cost the sum of $30,000.00, and which was the only real estate owned by the bank, at least the only real estate the least valuable.

"And your orators aver that all these acts and doings of said old stockholders, the presidents, Nutting and Gresham, and directors, and said bank, are contrary to equity and good conscience. And as your orators are wholly without an adequate and complete remedy at law, but can only have relief in your Honor's court of equity, where such matters are cognizable and relievable, they pray your Honor that the said old stockholders who have not *bona fide* paid up the cost of their original stock, or the stock held by them when they accepted said pretended and fraudulent stock dividends, may be compelled to pay up the same, and also that they may be compelled, by a decree of this honorable court, to refund to the bank, for the use of the creditors and the new stockholders who have paid up their stock *bona fide*, the full amount; and that they may account; and that

said bank shall account to your orators for the same, to the full extent of their liability, if necessary, after exhausting the funds of the bank; and that said directors shall be held liable, and account to your orators and oratrix for all the losses your orators and oratrix have sustained either by their fraudulent or negligent conduct, and that said C. A. Nutting, one of the directors and president of said bank, when these wrongs were inflicted, shall also be held to account for the same; and that, by a decree of this court against the said bank and its old stockholders. and its directors and said Nutting, all the contracts for the sale of said stock to your orators and oratrix be declared null and void, and be rescinded, and that your orator and oratrix may have such other and further relief as the nature of their respective cases may require, and as is in accordance with the principles of equity and good conscience. Your orator and oratrix expressly waiving any discovery or answer from either or any of said defendants."

To this bill defendants demurred,

(1.) For want of equity entitling complainants, or either of them, to the relief prayed.

(2.) That if complainants have any cause of action, their remedy for the same at common law is full, adequate and complete.

(3.) The bill is multifarious. It seeks 1st, to set aside and rescind the subscription of complainants to the capital stock of the city bank, for fraud in its procurement by the agents of the bank. 2d. It seeks to charge the agents of the bank as being liable to them for their fraudulent conduct. 3d. It seeks to charge the directors for the amount of the stock for their fraudulent conduct, by which the complainants' subscription was induced. 4th. It seeks to have the stock of the old stockholders issued to them, in the form of stock dividends, canceled and rescinded as having been fraudulently and illegally issued. 5th. It seeks to compel said stockholders to pay in for general distribution the amount of stock issued as dividends. 6th. It seeks to charge the directors for neglect and mismanagement. 7th. It seeks to charge the old stockholders with the amount of the subscription of complainants because they knew that they were subscribing for said stock under

false assurances, representations, etc.    8th. It seeks to charge the directors, as directors, for their fraudulent acts, and also seeks to charge them, as individuals, for the same acts.

The demurrer was overruled, and defendants excepted.

1. These are the only specifications under this head, and they amount to an averment of misjoinder of causes of action and of parties defendants.    There is no special ground in this demurrer, insisting that there was a misjoinder of parties as complainants, and although that ground was principally relied upon in the argument of this portion of the case, we have been unable to discover it in the pleadings, unless we are expected to infer it from the general allegation at the end of the 8th of the above grounds, in the words following, namely : "and with divers other inconsistent and conflicting claims, all contained and set out in the one bill to be covered by one decree."    This sweeping allegation is formal rather than substantial, and may be usually found in demurrers for multifariousness. There is, then, nothing in the pleadings to show that this question was passed upon by the lower courts, and. or this reason alone we might refuse to consider it here, and in view of the requirement that " the decision complained of and the alleged error shall be plainly specified," (Code, §4251), perhaps we ought not to consider this ground , but as no objection was urged to this course by the complainants here, we will treat it as though it had been properly and regularly made and insisted on.

Where the same bill embraces two or more distinct subjects, it is deemed multifarious.   According to one eminent English chancellor, who has been followed by many other judges and approved text-writers, it is impossible, upon the authorities, to lay down any rule or abstract proposition as to what constitutes multifariousness,which can be made universally applicable.   The cases upon the subject are extremely various, and the courts, in deciding them, seem to have considered what was convenient in particu-

lar cases, rather than to have attempted to lay down an absolute rule. Much of this doubtless results from treating as multifariousness what is, in fact, more properly misjoinder, that is to say, where the cases or claims united in one bill are of a character so different that the court will not permit them to be litigated in one record. It may be, that the plaintiffs and defendants are parties to the whole of the transactions which form the subject of the suit, and, nevertheless, those transactions may be so dissimilar that the court will not allow them to be joined together, but will require distinct records. Before a party can set up the defence of multifariousness, he must be able to say that he is brought as a defendant to a record, with a large part of which, and of the case made by which, he has no connection whatever. The bill must contain several distinct and separate matters relating to individuals with whom he has no concern. 1 Daniell's Ch. Pr., 334, 335.

But where the plaintiffs have a common interest against all the defendants in a suit, as to one or more of the questions raised by it, so as to make them all necessary parties for the purpose of enforcing that common interest, the circumstance of some of the defendants being subject to distinct liabilities in respect to different branches of the subject-matter, will not render the bill multifarious. More briefly and comprehensively expressed, the rule deducible from the cases and text writers seems to be that, " where there is a common liability and a common interest, the common liability being in the defendants and the common interest being in the plaintiffs, different grounds of property may be united in the same record." 1 Dan. Ch. Pr., 337, 338. In Campbell *vs.* Mackey, 1 M. & C., 603, 623, Lord Cottenham, from a full and careful review of all the cases, ancient and modern, has reached the conclusion above announced.

To these considerations should be added another, which of late years seems to have influenced this court in their dealings with this subject, viz: that each case is to be gov-

erned by its own circumstances, and must be left, in a great measure, to the sound discretion of the court. 12 *Ga.*, 61; Gaines *vs.* Chew, 2 How., U. S., 619; Oliver *vs.* Peate, 3 *Ib.*, 333.

This defence has never been favored by courts of equity on account of its tendency, where allowed, to protract litigation and to necessitate a multiplicity of suits. In the case quoted from 12 *Ga.*, *ut sup.*, it is said that "the courts always discourage the objection of multifariousness, where, instead of advancing, it would defeat the ends of justice." It is not an unimportant fact, nor one to be overlooked, in determining our legislative policy in this respect, that §4192 of our Code, which specifies the grounds upon which a demurrer will lie to a bill in equity, omits any mention of this particular one. by name, from the enumeration, and makes no allusion to it, unless it can be considered as embraced in the ground, which makes the bill demurrable for the misjoinder of "causes of action or parties," and we have seen that this is distinct from multifariousness.

Tested by these principles, the bill under consideration was not open to this objection. All the complainants belong to the same class, and had a common interest, while all the defendants belonged to but one class, and were subject to a common liability. The former were the holders of the new stock, which they were induced to subscribe and pay for, as they allege, by the misrepresentations of the accredited agents of the latter, who, by the terms of the charter, as set forth in the pleadings, could alone authorize the issue of this new or increased stock, and all of whom were benefited by the wrong done to these plaintiffs. The defendants were all stockholders in and members of the corporation, when the complainants were drawn into the association by the artful practices of their directors, president and cashier, each of whom was likewise a stockholder of that class, and who, along with the other holders and owners of the original stock, shared

in the profits arising from the transaction, and to that extent, contributed to the injury of each and all of the complainants.

It matters not that the extent of the rights of each of the complainants, or the liability of each of the defendants, may not be the same or that the measure of the liability of the corporation and its officers and directors may be different from that of the other defendants, the original stockholders; this will not serve to render the bill multifarious, or make it improper to adjust these respective rights and liabilities upon one record. It is enough that they are brought into court upon a record and a case with a large part of which they are connected, and that they are necessary parties to enable the complainants to attain the full measure of the rights they seek. There was, therefore, no error in overruling this ground of the demurrer. The objection urged to a single portion of the prayer, disconnected from the statements in the bill and the remainder of the prayer, was not tenable. In order to determine whether a bill is multifarious, regard must be had to the stating part and not to the prayer alone. Hammond *vs.* Mich. Railroad, Walker Ch. R., 214.

2, 3. It was not seriously contended at the hearing before this court, that the statements in this bill, apart from other defects insisted upon, did not make a case for a court of equity. The proposition that this court is the proper forum to redress frauds, by which parties were induced to take stock in trading corporations or joint stock companies, was too obvious to admit of serious argument, and hence, was not urged. Morawetz on Priv. Corp., §§299, 309.

Leaving this broad ground, the demurrer was narrowed to a single point, viz: that if the party desires to annul such a contract, he must proceed with the utmost diligence; that this rule of diligence is founded upon the most obvious principles of justice; that a contract induced by fraud is valid until it is avoided by the innocent party; that one who has thus been induced by fraud or deception to take

shares in a corporation, is in every respect a stockholder, and entitled to the benefits of membership, until he has elected to repudiate his contract; if then, he was permitted to delay declaring his contract void on account of the fraud, injustice would be done the other stockholders, for the former would be enabled to speculate upon the value of his shares, to repudiate them if the speculation should prove a failure, and to hold them valid in case of success. Diligence is also required, lest other persons be misled by the fact of his remaining a member of the association. Morawetz Pr. Corp., §310.

This statement of the law, as far as it goes, is correct, but it does not state the proposition fully. If the stockholder had notice of the facts, enabling him to repudiate his contract on account of fraudulent representations, and elected to treat it as valid, he could not afterwards refuse to be bound by it. The rule, as thus qualified is, "that a person who was induced by fraud to purchase shares in a corporation cannot avoid his contract, if, after having acquired notice of the fraud, he has derived any benefit from his shares, or in any manner has acted as a stockholder." *Ib.*

Ashley's Case, L. R., 9, Eq. 363, much insisted upon here, is, in its circumstances, just the reverse of the case made by this bill. Ashley, after having heard the facts which induced other stockholders to institute proceedings to annul their contract fully discussed, remained quiet for sixteen months; during that time he appeared to be undecided; he did nothing; did not say he dissented, or that he assented; he seems to have been awaiting the result of the litigation of the dissentient shareholders with the company, before he concluded upon his course; the court, Lord Romilly, M. R., held that "nothing was more clear than that he could not do this: that he should have written to the company and said, 'I dissent, and if you will agree, I will be bound by the decision in this case which is being tried.' But he remains

quiet for sixteen months, and if the company had been successful, and the directors had said, when the decision in the case was given, 'You are a dissentient shareholder and are bound by this decision,' he would have replied, 'Where do you find that? I challenge you to put your finger on anything to show I ever dissented;' and he might have taken the whole of his share of the profits of the company, whatever they were. But if he had expressly said, 'I am a dissentient shareholder, and I put myself in that list,' it follows that, if the company had been successful, he could not afterwards have claimed a share of the profits of the company, and would have been bound by the decision in the case" of the shareholders who dissented.

"This was the simple case of a shareholder who knew that nineteen other shareholders of the company dissented, and that the company had suspended legal proceedings until it was determined whether these shareholders were entitled to dissent; but he did not make up his mind whether he would assent or dissent until the question was decided; and in the meantime the company was buying estates and carrying on business." It was in reference to these facts that the Master of the Rolls laid down the principle that "a man must not play fast and loose; that he must not say, 'I will abide by the company if successful, and I will leave the company if it fails;' and therefore whenever a misrepresentation is made, of which any one of the shareholders has notice, and can take advantage to avoid his contract with the company, it is his duty to determine at once whether he will depart from the company, or whether he will remain a member. When I say, 'as soon as he has notice,' I do not mean that he may stand by, when a great number of people tell him that misrepresentations have been made by which shareholders have been induced to take shares, and that he may wait until it is decided by a court of justice that there have been misrepresentations; on the contrary, I mean that it is his duty, in such a case, to go and ascertain for himself

whether there is a misrepresentation or not." And that is precisely what appears to have been done in the case at bar. According to the statements in this bill, the complainants, as soon as they were apprised of the embarrassed condition of the bank, sought an investigation of its affairs, in order to get proof of the alleged misrepresentations, but were denied, by the officers of the company, access to its books and papers, for the purpose of ascertaining the facts upon which their course in reference to the matter now in controversy was to be determined. After this time, it does not appear that they ever derived any benefit from their shares, or that they acted in any manner as stockholders. How all this may turn out upon a full investigation of the case, we do not know and cannot anticipate. We decide nothing but the questions made by the demurrer to the bill, and have not looked into the answer or any part of the transcript of the record, other than such as was essential to the determination of these questions.

4. The remaining ground of the demurrer, that the complainants' remedy, if any, was full, adequate and complete at law, which was mentioned in the argument, but not pressed, is disposed of by what has been already said.

Judgment affirmed.